**JOHN A. JOHNSON CONTRACT-ING CORP.**

v.

**UNITED STATES.**

No. 47607.

United States Court of Claims.

April 6, 1954.

Max E. Greenberg, New York City, for plaintiff.

Kendall M. Barnes, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER and MADDEN, Judges.

MADDEN, Judge.

The plaintiff, on December 15, 1942, made a contract with the Government, which acted through the War Department's Corps of Engineers, to construct the U. S. Army General Hospital at Utica, New York. There were to be 122 buildings, with connecting enclosed walkways, and the contractor was to install all utilities, place the surfacing on the roads, and do the finished grading

and seeding of the grounds. The Government was to furnish various items of material which would be incorporated in the structures. Other items, including lumber and nails, were to be obtained by the plaintiff from sources and through allocations to be designated by the Government.

The work was divided into four groups, one group to be completed by each of the following dates: March 1, March 15, April 15, and May 15, 1943. Especially in view of the extreme cold weather which prevails in the area, the completion of the work within the specified times was hardly to be expected, though it was not impossible.

The whole project had been thought up in a hurry, in the fall of 1942. The site selected was a sloping hillside, with a drop of some 50 feet in elevation in the 2,000 feet of its north to south dimension. The plan called for terracing the hillside and for placing roads and buildings on a succession of levels. In order to get the work started, a contract for the grading for the roads and terraces, the construction of the roads, except for their final smooth surfacing, and the construction of the drains, was let to the Winkleman Company on November 4, 1942, which was before the plans for the buildings had been completed. Winkleman's work was to be completed by December 5, subject to the usual provisions about excusable delays. Winkleman was delayed by wet weather. Priority was given to the construction of roads, which involved the making of cuts and fills. The fills were placed on wet ground, the earth placed in the fills was wet, and there were drenching rains while the work was being done. The ground froze at night and some frozen ground was placed in the fills. A 12-inch course of bank gravel was placed by Winkleman on the roads, but, as we have said, the final smooth surface of the roads was to be placed by the building contractor after the completion of the buildings.

When bids for the construction of the hospital were invited, the plaintiff's representatives visited the site, on December 10 and 11, 1942, and observed but paid no particular attention to the road and grading work which was in progress.

Both parties assumed that the plaintiff would use the roads, as constructed by Winkleman, as haul roads in connection with its building operations.

On December 21, 1942, the plaintiff was given notice to proceed. By that time Winkleman had completed the grading of 41 building sites, and was still working on the roads and the grading, and continued to work through January and until February 27, 1943, when that work was suspended because of the cold weather. By the time of the suspension, all the main access roads and most of the drainage ditches were built.

During January and February the ground froze so hard that trucks could travel anywhere on it. Holes for foundation piers for the buildings had to be dug, but the digging was difficult and expensive because of the frozen ground and the plaintiff did not place as many piers as it might have. The same was true as to the digging of trenches for the placing of pipes for the utilities. The plaintiff anticipated, probably with reason, that much of the work would not in any event be completed before spring, and it therefore sought to avoid the expense of digging in the frozen ground. There had also been delays in the furnishing of materials to be furnished by the Government, or to be obtained upon Government allocation.

By March 10, the plaintiff was getting ready for the big push toward getting the job forward. Heavily loaded trucks were moving lumber on to the site in great volume. Surveys had been made for the utility trenches and equipment to dig them was available. On March 11, the spring thaw began, some weeks earlier than usual. There was rain, off and on for several days. The heavy hauling continued, and within a week or ten days after March 11, the whole road system disintegrated. Trucks sank in the mire to the cab. Tractors, sent to pull out the trucks, had to be pulled out

by caterpillars. What happened to the roads was that, as the frost came out of the ground, the moisture, because of the depth to which the ground was frozen, could not drain downward, hence it was carried toward the surface by capillary action. It thus soaked the soil under the 12-inch gravel course of the roads, and the loads crushed the gravel into the mud. The fact that the earth bases under the gravel had been wet and frozen when the gravel was placed, the fact that the drainage ditches at the sides of the road were not adequate, and had in some instances been obstructed by the plaintiff, and the unusual capillarity of the soil, all made their contribution to the collapse of the road system. The only thing that would have saved the roads would have been to keep loaded vehicles off them for several weeks. Neither party even seriously thought of doing that. Both were intent on getting the work forward. The contracting officer took the position that it was the plaintiff's responsibility to keep the roads passable, or to get its work done somehow. The plaintiff's position was that the failure of the roads was a breach of contract by the Government, for which the plaintiff would make a claim.

At very great extra expense, by unloading, hand handling, hauling in brickbats, slag, and cinders, miring down and digging out, placing equipment on pontoons, the work proceeded, greatly delayed, of course. After the frost was out of the ground the month of April was wet and cloudy, and May and June were rainy. The site did not dry out enough for grading operations to be resumed by Winkleman until July.

On April 19, 1943, the plaintiff notified the Government that a formal claim would be filed. It filed such a claim on May 24. In the statement the plaintiff said, among other things, that it had "encountered unforeseen conditions beyond its control and not due to its fault or negligence." It requested the contracting officer to make findings of fact and presented 122 proposed findings of fact in separate, numbered paragraphs.

On July 5, 1943, the plaintiff filed a supplementary statement. This and the earlier statement, considered together, gave adequate notice to the contracting officer that the plaintiff was asking for compensation for the expense incurred because the plaintiff had "encountered unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications." Article 4 of the contract provided for additional compensation in such a situation.

On October 19, 1943, the contracting officer denied the plaintiff's claim. He did not make findings of fact with regard to the plaintiff's claim that it had encountered unknown conditions, and apparently gave no consideration to that claim. On November 16, 1943, the plaintiff appealed the decision of the contracting officer to the Secretary of War, stating that the appeal was made pursuant to Article 15 of the contract. That article provided that the contracting officer was authorized to decide all disputes concerning questions of fact, subject to a right in the contractor to appeal to the Secretary of War, whose decision, or that of his representative designated by him to hear the appeal, should be final.

On December 13, 1945, the War Department Board of Contract Appeals, which had been designated by the Secretary of War to hear such appeals, made its decision. It denied the first three of the plaintiff's claims and dismissed the other seven. Its dismissal was on the ground that the last seven claims were claims for unliquidated damages based upon an alleged breach of contract, the failure of the road bases and drains, and that Article 15 did not authorize the contracting officer or the board to decide claims for unliquidated damages for breach of contract.

The Board, in its opinion, in taking jurisdiction of the first three claims, said that they were claims on account of changes, within Article 3 of the con-

tract, or for changed conditions, within Article 4. Article 4, whose title is "Changed Conditions" is the article relating to unknown and unanticipated conditions. The Board said that "the acts of the appellant, in substantial part, caused the almost total failure of the roads and drains thus necessitating the * * * work" for which the claim was made. In its "decision" which followed its factual summary, the Board said:

> "It cannot be said that the work forming the basis for the instant claims was necessitated by or the result of 'Changes', 'Changed Conditions', or 'Extras' within the purview of the contractual provisions relating to these subjects."

If the question were open for our decision, our conclusion might be that the plaintiff did encounter "unknown conditions of an unusual nature" within the meaning of Article 4 of the contract. The question was, however, one of fact, the plaintiff presented the matter fully to the Board of Contract Appeals, and its decision was final. United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113.

 The plaintiff's Claims 4 through 10 were not decided by the Board. Strictly speaking, then, they would be open for our decision. If, as the Board did decide in connection with Claims 1, 2, and 3, the plaintiff did not encounter "unknown conditions" within the meaning of Article 4, it must have gotten substantially as good roads and drains as it was entitled to expect under its contract. We think it would, in the circumstances, be an evasion of the doctrine of United States v. Wunderlich, supra, for us to make a decision as to Claims 4 to 10 flatly inconsistent with the decision of the Board of Contract Appeals on what is really the same question.

After it had filed its claim with the contracting officer, the plaintiff continued with its work. On May 18, 1943, it requested extensions of time, and on June 7, the contracting officer extended the time for completion of all four groups of the plaintiff's work to June 30, on account of unusual weather, delays in delivery of Government allocated and Government furnished materials, and a critical shortage of labor. At the time of the granting of this extension, the contracting officer did not expect that the work on the buildings, which comprised Groups 1, 2, and 3 of the plaintiff's work could be finished by June 30, and knew that the Group 4 work, road surfacing and final grading, could not be done until the building work was completed. The June 30 date was apparently set with regard to the close of the fiscal year on that day.

Not until the end of June was the ground dry enough for the work of placing topsoil and seeding, and road surfacing. Winkleman, the contractor for rough grading, had been delayed as was the plaintiff, and some of that work was still undone when July 1 came. The plaintiff and Winkleman got in each other's way. There were heavy rains in July and August, and because of faulty setting of grades by the Government's agents, water ponded under some of the buildings and buckled the floors. In between rains, the dust caused by the work on the site became a nuisance.

In the Army's chain of command in the area, the Commanding General of the Second Service Command was at the top. At the hospital itself the senior medical officer was in command, and had authority over the officers of the Corps of Engineers who were building the hospital. The senior medical officer had been in Utica during the cold of the winter, the mud of the spring, and the dust of the summer. He was under pressure from above to get the hospital completed. During June and July, medical supplies and hospital equipment were moved into some of the buildings. Early in August the first trainload of wounded soldiers arrived at the hospital. In that month the question of further extensions of time for completion of the plaintiff's work came up. Under the Army chain of command, the contracting officer was required either to obtain the approval of the commanding officer of any extension which he proposed to

make, or to submit the recommended extension to higher authority. The contracting officer requested the approval of the commanding officer, the senior medical officer, for an extension of the plaintiff's time for the completion of the Group 4 work, which was the road and final grading work.

The commanding officer was disgusted with the situation, thought the drainage arrangements were inadequate, and demanded that the Corps of Engineers terminate the plaintiff's right to proceed, take over the work themselves or get someone else to do it, and, in so doing, overhaul and amplify the drainage system. Plans were drawn accordingly, which increased the capacity of the drainage system, added to it culverts, catch basins, and riprap, and called for some additional roads. Under these plans the continuation of work by Winkleman under the revised plans, and by the plaintiff under its original plans, would have resulted in extensive duplications and additional costs. The contracting officer decided that one contractor should perform all the work under the revised plans, and also all the uncompleted work of both the plaintiff and Winkleman under the original plans, so far as that work had not been affected by the revised plans. He decided to terminate the plaintiff's contract as to the Group 4 work, and gave all the work described above to Winkleman.

The plaintiff was notified of this action on August 21, 1943. It was told to make a survey of the work it had done on Group 4 items and that it would be paid for that work. At that time the contracting officer intended to terminate the plaintiff's Group 4 work for the convenience of the Government, and had no thought of charging the plaintiff for the excess cost of getting the work done by someone else. However, the contracting officer was advised by Government lawyers that if he terminated the plaintiff's contract and had another contractor complete the work, and did not back-charge the plaintiff with the excess cost of the work, legal complications would result. The contracting of-

ficer for that reason, on August 28, 1943, formally notified the plaintiff that its Group 4 work was terminated under Article 9 of the contract because of delay by the plaintiff in the progress of the work.

The Group 4 work was completed in due course by Winkleman, at unit costs which were reasonable but were greatly in excess of those specified in the plaintiff's contract, and the plaintiff was charged with the excess.

On September 12, 1943, the plaintiff requested extensions of time for all groups of its work. As to Group 4, it asked for an extension to August 24, the day on which it was notified to stop that work. If that extension had been granted, it would seem to have meant that the plaintiff was not in default when the work was terminated on the stated ground that it was in default. The contracting officer, on February 8, 1944, extended the time for the Group 4 work, which had formerly been extended to June 30, only to July 30. As to the plaintiff's building operations, its time was extended to the actual completion dates in September and October.

On March 8, 1944, the plaintiff appealed from the contracting officer's decision as to extensions of time to the Secretary of War. On May 10, 1944, the plaintiff protested to the contracting officer his action in backcharging to the plaintiff the excess costs of completion. On June 17, the contracting officer denied the protest. On July 15, the plaintiff appealed this decision to the Secretary of War. After each of the foregoing appeals the contracting officer made detailed findings of fact which were in the nature of the brief of an advocate opposing the plaintiff's appeal. On December 14, 1945, the War Department Board of Contract Appeals denied the plaintiff's appeals.

■ The action of the contracting officer on these two problems was vulnerable in two respects. As to the denial of the extension of time, he did not himself decide the question. He had intended to grant the extension, but abdicated his contractual responsibility to

the commanding general. His action in terminating the Group 4 work for delay did not represent his judgment as to the merits of the case, but was a device to satisfy what lawyers told him were, or probably were, the legal requirements of the situation. But, whatever might have been the status of the case if it had stopped there, the plaintiff appealed, as he was obliged to do,[1] and after a full opportunity to present his case to the Board of Contract Appeals, he received an adverse decision on the merits. If the question were open to us, we would be obliged to say that that decision was not supported by substantial evidence, on the whole record, at least as that record stands in this court. But of course the Board was not guilty of fraud, hence United States v. Wunderlich, supra, is a bar to the plaintiff's claim.

The plaintiff's petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and WHITAKER and LITTLETON, JJ., concur.

---

1. See United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039.